**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **DAVID K. AND DEBRA L. BAILEY**<br>754 Spar Mill Road<br>Burnsville, NC 28714<br><br>**WILLIAM C. AND HELLER BATTON**<br>2600 Laurel Brook Road<br>Fallston, MD 21047<br><br>**GREGORY P. DOPKOWSKI, SR.**<br>311 Lorraine Avenue<br>Essex, MD 21221<br><br>**SAMUEL AND BEVERLY PATTERSON, JR.**<br>4000 Balmoral Circle<br>Pikesville, MD 21208<br><br>**RAHEIM AND SYREETA PATTERSON**<br>3636 Clifmar Road<br>Windsor Mill, MD 21244<br><br>**ARNOLD N. AND LOIS A. WELSH, JR.**<br>2259 Ridgemont Drive<br>Finksburg, MD 21048<br><br>*Plaintiffs*,<br><br>v.<br><br>**SIERRA PACIFIC MORTGAGE COMPANY, INC.**<br>1180 Iron Point Road, Suite 200<br>Folsom, CA 95630<br>    <u>Serve on:</u> National Registered Agents, Inc.<br>    of MD, Resident Agent<br>    2405 York Road, Suite 201<br>    Lutherville-Timonium, MD 21093<br><br>*Defendant*. | Civil Action No.: |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1

Plaintiffs, David K. and Debra L. Bailey, William C. and Heller Batton, Gregory P. Dopkowski, Sr., Samuel and Beverly Patterson, Jr., Raheim and Syreeta Patterson, and Arnold N. and Lois Welsh, Jr., on behalf of themselves and on behalf of the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph, Greenwald and Laake, P.A., file this Class Action Complaint, sue the Defendant for cause, claim damages, and state as follows:

**<u>INTRODUCTION</u>**

1.  Plaintiffs David K. and Debra L. Bailey ("Bailey Plaintiffs"), William C. and Heller Batton ("Batton Plaintiffs"), Gregory P. Dopkowski, Sr., Samuel and Beverly Patterson, Jr. ("Patterson Parent Plaintiffs"), Raheim and Syreeta Patterson ("Patterson Plaintiffs"), and Arnold N. and Lois Welsh, Jr. ("Welsh Plaintiffs") (collectively, "Plaintiffs") and alleged Class Members are borrowers who currently have or had a residential mortgage loan originated and/or brokered by Defendant Sierra Pacific Mortgage Company, Inc. ("Sierra Pacific"), which was or is secured by Plaintiffs' and Class Members' residential real property.

2.  Plaintiffs and alleged Class Members are victims of an illegal kickback and price fixing scheme between Sierra Pacific and All Star Title, Inc. ("All Star"), a Maryland-based title and settlement services company.

3.  Under the scheme, Sierra Pacific's branch managers, loan officers, agents, and/or other employees received and accepted illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.* Sierra Pacific and All Star laundered the

kickbacks through third party marketing companies to conceal the illegal kickbacks and the kickback agreement.

4.  As an essential component of the scheme, All Star conspired to and formed a cartel with various residential mortgage lenders ("All Star Lender Cartel"). Sierra Pacific participated in the All Star Lender Cartel and, in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, entered into naked price fixing, minimum pricing and refusal to deal agreements (collectively, the "Cartel Agreements") with All Star related to the residential mortgage loans generated by All Star's illegal kickback payments to Sierra Pacific.

5.  Sierra Pacific benefitted, and upon information and belief, continues to benefit from the Cartel Agreements, because the supracompetitive prices for title and settlement services charged to Sierra Pacific borrowers under the Cartel Agreements were financed into the borrower's loans, and which Sierra Pacific charges and earns interest from these supracompetitive prices.

6.  Sierra Pacific and All Star continuously and regularly used the U.S. Mail and interstate wires in furtherance of the kickback and price fixing scheme, and to identify and defraud borrowers into the All Star Scheme, willfully and intentionally engaging in a pattern of racketeering activity over a period of at least five years, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*

7.  The kickback and Cartel Agreements, and the resulting supracompetitive prices, were fraudulently concealed by Sierra Pacific and All Star from Plaintiffs and alleged Class Members by: laundering kickbacks through third party marketing companies, creating sham invoice and payment records, fraudulent representations in marketing materials, false allocation of title and settlement fees and manipulation of the APR associated with

Sierra Pacific loans, and false and fraudulent representations and omissions in Sierra Pacific borrowers' loan documents, and prevented borrowers, regulators and auditors from discovering the scheme or kickback and Cartel Agreements and the injuries to Sierra Pacific borrowers therefrom, thereby allowing the kickbacks and supracompetitive fees to continue.

## PARTIES

8.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

9.   Plaintiffs David K. and Debra L. Bailey are residents of Yancey County, North Carolina.

10.   Plaintiffs William C. and Heller Batton are residents of Harford County, Maryland.

11.   Plaintiff Gregory P. Dopkowski, Sr. is a resident of Baltimore County, Maryland.

12.   Plaintiffs Samuel and Beverly Patterson, Jr. are residents of Baltimore County, Maryland.

13.   Plaintiffs Raheim and Syreeta Patterson are residents of Baltimore County, Maryland.

14.   Plaintiffs Arnold N. and Lois Welsh, Jr. are residents of Carroll County, Maryland.

15.   Defendant Sierra Pacific Mortgage Company, Inc. is a corporation organized under the laws of California and at all relevant times was registered and qualified to do business in Maryland. It is engaged in the business of consumer mortgage brokering and/or origination and/or lending and/or otherwise transacted business in the state of Maryland and in other states.

## JURISDICTION AND VENUE

16.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Section 4 of the Sherman Act, 15 U.S.C. § 4, and 18 U.S.C. § 1964(c).

17.   This Court has personal jurisdiction over the parties.  Personal jurisdiction over Sierra Pacific is appropriate because during the time period alleged herein Sierra Pacific

continuously transacted business within this District and engaged in an illegal price fixing agreement to fix the prices charged by All Star for settlement services that was directed at, and had the intended effect of causing injury to, persons residing in or located in this District. In addition, Sierra Pacific currently transacts business within this District.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because Sierra Pacific is subject to personal jurisdiction in this District and a substantial part of the conduct, events, and omissions giving rise to Plaintiffs' and Class Members' claims occurred within this District, and a substantial portion of the affected interstate trade and commerce has been carried out in this District.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

19.    At all relevant times, All Star is a Maryland corporation and a title and settlement service provider licensed in Maryland and regulated by the Maryland Insurance Administration. All Star is a licensed title and settlement service provider in more than 30 states, and provides title and settlement services on residential mortgage loans, refinances and reverse mortgages secured by real property in 47 states.

### I.    The All Star Scheme

#### A.    All Star and Participating Lenders Pay and Receive Kickbacks in Exchange for the Assignment and Referral of Residential Mortgage Loans to All Star and Employ Several Methods to Conceal the Kickbacks.

20.    Beginning by at least 2008, All Star designs and executes a scheme ("All Star Scheme") to pay kickbacks to various mortgage lenders and their brokers, loan officers and other employees (collectively, "Participating Lender") in exchange for the Participating Lender's assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services ("Kickback Agreement").

5

21. All Star bases the amount of the kickback All Star paid on the number of loans the Participating Lender assigns and refers to All Star under the Kickback Agreement and the amount of profit All Star realizes on those loans.

22. All Star pays, and Participating Lenders receive and accept, kickbacks in different forms and laundered by and through different channels.

23. In some instances, All Star pays kickbacks by purchasing and delivering to a Participating Lender marketing materials for the Participating Lender to use in soliciting borrowers, most commonly postage to be used by a Participating Lender to send direct mail solicitations.

24. In other instances, All Star pays cash kickbacks by checks written directly to a Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees.  Often, a Participating Lender or its employee receives and accepts a kickback check laundered by and through a sham entity set up for the express purpose of receiving and accepting kickbacks and concealing the same.

25. In most instances, to further conceal the kickbacks, the Participating Lenders and All Star agree to have All Star not issue a check directly to the Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees, but instead launders the kickback payment through a third party marketing company.

26. Participating Lenders and/or their branch managers, mortgage brokers, loan officers, or other employees frequently use third party marketing companies (such as a direct mail, data and/or leads lists, telemarketing or live transfer leads provider) to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances and reverse mortgages, which increase the volume of loans the Participating Lender brokers or originates thereby increasing its net profit and commissions earned.

27.    All Star and Participating Lenders use a variety of third party marketing companies to launder the kickbacks. Some of these marketing companies specialize in direct mail, while others specialize in producing data and leads lists of potential borrowers for direct mail or telemarketing solicitations. Still other third party marketing companies provide Participating Lenders "live transfer" leads in which a borrower who contacts a centralized telemarketing company is transferred "live" to the Participating Lender.

28.    Under the Kickback Agreement, the Participating Lender receiving and accepting the kickback from All Star identifies a third party marketing company that the Participating Lender uses for marketing services. The third party marketing company then produces an invoice for marketing services it produces for the Participating Lender that was subject to a kickback, All Star then makes the kickback payment to the third party marketing company, and the Participating Lender receives and accepts the kickback payment when the third party marketing company applies the payment to the invoice for marketing services for the benefit of the Participating Lender.

29.    To even further conceal the kickbacks and the Kickback Agreement, All Star and the Participating Lenders request and cause the third party marketing companies to issue sham invoices that falsely identify All Star as the company purchasing and receiving the marketing services. These sham invoices create the false impression that All Star purchases and receives marketing services when in fact the payment is a kickback received and accepted by the Participating Lender in exchange for the assignment and referral of loans to All Star under the Kickback Agreement.

30.    The sham invoices conceal the fact that any thing of value is exchanged between All Star and the Participating Lender related to the loans that are assigned and referred to All Star under the Kickback Agreement.

31.     In some instances, All Star and the Participating Lender direct the third party marketing company to create and/or receive sham split invoices, of which one invoice for a portion of the amount due to the third party marketing company is sent to the Participating Lender and one invoice for the other portion of the amount due to the third party marketing company is sent to All Star.

32.     All Star and the Participating Lenders' choice to use the split invoices create the false impression that All Star purchased and received marketing services when in fact the payment is a kickback received and accepted by the Participating Lender in exchange for the assignment and referral of loans to All Star under the Kickback Agreement.  The sham split invoices also hide All Star and the Participating Lender's coordinated business relationship because there is no Participating Lender listed on the sham split invoice received and paid by All Star.

33.     In other instances, All Star and the Participating Lenders choose to conceal the kickback payment entirely by creating sham payment records. To do this, a Participating Lender directs All Star to launder a kickback through the third party marketing company without the use or issuance of any invoice.  Other times, the Participating Lender forwards to All Star an invoice addressed to the Participating Lender and All Star launder a kickback through a third party marketing company by simply referencing the Participating Lender's invoice number.

34.     All Star and Sierra Pacific's choice to use sham invoice and payment records is integral to the Kickback Scheme and Agreement and is designed to hide the fact that payment is made by All Star. These choices by All Star and Sierra Pacific, among with  the choice to launder the payoffs through marketing companies, also conceal the fact that All Star and

the Participating Lender exchanged a thing of value related to the loans that are assigned and referred to All Star under the Kickback Agreement.

**B. All Star and Participating Lenders Form a Cartel and Conspire and Agree to Fix and Charge Borrowers Higher Prices for Title and Settlement Services and Refuse to Deal with Competitors.**

35. One of the purposes of the All Star Scheme is to allow All Star to charge borrowers higher prices for title and settlement service than is possible in a competitive market and to exclude other title and settlement services from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages.

36. To achieve these purposes, All Star and Participating Lenders conspire to and form a cartel ("All Star Lender Cartel"), enter agreements and act in restraint of trade.

37. To enforce the All Star Lender Cartel, All Star and Participating Lenders conspire and agree to fix the prices All Star charges the Participating Lender's borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement ("Price Fixing Agreement").

38. In addition, All Star and the Participating Lenders conspire and agree to minimum prices to charge borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement ("Minimum Fee Agreements").

39. The Price Fixing and Minimum Fee Agreements are enforced by an agreement that the Participating Lender refuse to deal with any other title and settlement services company on those loans generated by the kickbacks ("Refusal to Deal Agreement") (collectively, with the Price Fixing and Minimum Fee Agreements, the "Cartel Agreements"), such that all loans generated by the Kickback Agreement are referred to All Star and are subject to the Price Fixing and Minimum Fee Agreements.

40.     The prices All Star and the Participating Lenders fix under the Price Fixing and Minimum Fee Agreements are supracompetitive and higher than the prices that borrowers would otherwise be charged for title and settlement services in a competitive market and without the Cartel Agreements.

41.     An additional purpose of the All Star Lender Cartel formed by All Star and Participating Lenders under the Kickback and Cartel Agreements is to exclude All Star's competitors from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages, and to deprive borrowers of their choice of title and settlement service provider on loans generated by the All Star funded kickbacks.

42.     Participating Lenders benefit from the Cartel Agreements because: (i) the supracompetitive pricing funds the illegal kickbacks used by Participating Lenders to solicit borrowers, generate residential mortgage loans, and earn substantial interest and commissions, and (ii) the costs for title and settlement service fees are financed into the loan and paid for by borrowers from loan proceeds such that the Participating Lender earned interest and other fees from the supracompetitive pricing.

> **C.     All Star and the Participating Lenders Use the U. S. Mail and Interstate Wires to Identify and Lure Borrowers into the All Star Scheme.**

43.     All Star and Participating Lenders intend the All Star Scheme to defraud borrowers into paying supracompetitive prices for title and settlement services and to thereby fund and continue the kickbacks All Star is paying Participating Lenders.

44.     In service of this intention, Participating Lenders and All Star use the kickback payments to lure borrowers into the All Star Scheme, and in turn use the interstate mails and wires to identify, solicit and lure borrowers into the All Star Scheme.

45.    Potential borrowers are identified by the third party marketing companies through which All Star and Participating Lenders are laundering the kickbacks.  Many of these third party marketing companies specialize in identifying and soliciting potential borrowers, and compiling and selling borrower sales and marketing "leads lists."

46.    Participating Lenders use these lists to solicit borrowers often through printed direct mail pieces such as postcards, letters, "SNAP packs" (mailers with perforated edges the recipient rips or "snaps" open), and other printed material that encourage borrowers to contact the Participating Lender and apply for a residential mortgage loan, refinance or reverse mortgage.

47.    All Star requires, and Participating Lenders agree, to include false representations in the Participating Lender's direct mail borrower solicitations, stating that a potential borrower would save "30-40% on title fees" by using All Star.  The purpose of these false representations is to: (i) prevent a borrower from trying to use a different title and settlement services company for the loan, (ii) conceal the fixed, supracompetitive pricing resulting from the All Star Scheme, and (iii) create the false representation that the prices charged the borrower for title and settlement services would be lower than the prices charged by All Star competitors.

48.    Participating Lenders and All Star, by and through third party marketing companies, cause borrower data and leads list to be merged onto these direct mail solicitations, and Participating Lenders, by and through the third party marketing companies, cause these fraudulent solicitations to be sent through the interstate U.S. mails.

49.    All Star and Participating Lenders also obtain from third party marketing companies borrower data and leads list to solicit borrowers over the telephone, and Participating Lenders use interstate wires to make these telemarketing calls to potential borrowers.

Plaintiffs believe, and therefore aver, that All Star requires, and Participating Lenders agree, to make false representations to borrowers in these telephone solicitations similar to the false representations that All Star and Participating Lenders agree to include in direct mail solicitations.

50.     Participating Lenders also receive "live transfer" leads wherein a borrower calls a centralized call center, and then is transferred by the call center "live" to the Participating Lender. The third marketing company delivering the live transfer leads transmits the "live transfer" over interstate wires, and the Participating Lender receives the live transfer calls over interstate wires.

51.     All Star's records document that these borrower solicitation techniques lured thousands of borrowers into the All Star Scheme.

### II.     Sierra Pacific's Participation in the All Star Scheme Beginning by January 2012

52.     By approximately January 2012, Sierra Pacific begins conspiring with All Star to enter the All Star Lender Cartel and Kickback Agreement and to conceal the kickbacks and overcharges on borrowers' HUD-1s.

53.     By at least March 2012, Sierra Pacific, by and through its branch managers, loan officers and other employees, agree to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of Sierra Pacific loans to All Star for title and settlement services, and assign and refer more than 300 loans to All Star involving residential mortgage loans, refinances or reverse mortgages secured by property in over four states.

54.     All Star pays, and Sierra Pacific receives and accepts, kickbacks that were laundered through third party marketing companies used by Sierra Pacific for marketing services.

55.     At all relevant times, Sierra Pacific branch managers and loan officers who received and accepted kickbacks are licensed mortgage brokers and/or authorized loan officers, and at

all relevant times are acting within scope of the business relationship and duties of their employment on behalf of Sierra Pacific, specifically seeking borrowers and originating and securing loans for residential mortgages through Sierra Pacific and/or brokering such loans through Sierra Pacific to other lenders with whom Sierra Pacific authorizes, referring Sierra Pacific borrowers to title companies, and working with title companies to close these loans.  All activities, including interaction with All Star, are for the benefit of Sierra Pacific.

### A.    Sierra Pacific's Participation in the All Star Scheme by and through the Sierra Pacific White Marsh Branch

56.    Beginning in January 2012 through the present, Todd Asplen ("Asplen") is a branch manager and licensed mortgage originator employed by Sierra Pacific at a branch first located at 7718 Belair Road, Baltimore, MD 21236, then at 8032 Belair Road, Nottingham, MD 21236, and later at 11100 Pulaski Highway, Bldg. C, White Marsh, MD 21162 ("Sierra Pacific White Marsh Branch").

57.    Beginning in January 2012 through the present, David Brown ("Brown") is a licensed mortgage originator employed by Sierra Pacific at the Sierra Pacific White Marsh Branch.

58.    In furtherance and performance of the and All Star Scheme and All Star Lender Cartel, Sierra Pacific enters into naked price fixing agreements in which All Star and Sierra Pacific conspire to and fix the prices charged borrowers for title and settlement services at supracompetitive levels and at levels higher than would have been charged without the price fixing agreements.

59.    In furtherance and performance of the and All Star Scheme and All Star Lender Cartel, Sierra Pacific also enters into Minimum Fee Agreements in which All Star and Sierra

Pacific conspire to and fix minimum prices to be charged to Sierra Pacific borrowers for title and settlement services on loans assigned and referred by Sierra Pacific to All Star under the Kickback Agreement.

60.     By approximately January 2012, All Star and Sierra Pacific conspire and agree to fix prices in relation to loans assigned and referred to All Star by the Sierra Pacific White Marsh Branch to "$800 plus title insurance" and for loans located in Pennsylvania to "$695 plus title insurance."  *See* 1/12/12 Fee Sheet, attached as **Exhibit 1**; *see* 2/1/12 e-mail between All Star and Brown, attached as **Exhibit 2**.

61.     A few months later, , on March 20-21, 2012, All Star and Sierra Pacific raise the fixed price charged for loans referred to All Star by the Sierra Pacific White Marsh Branch to $1,750.  All Star and Sierra Pacific agree to raise the fixed prices under teh Cartel Agreements because of the kickbacks All Star is paying Sierra Pacific by and through third party marketing companies. Sierra Pacific agrees to All Star's requirement that "I'll have to have them to be at that rate for all files like we did in the past.  Jason wants to make sure that we capitalize in the case that the marketing flops."  *See* 3/21/13 e-mails between All Star and Asplen, attached as **Exhibit 3**.

62.     In accordance with and in furtherance of the Kickback Agreement and All Star Scheme, on or about March 21, 2012, All Star pays a $2,512.50 kickback to Sierra Pacific by and through Titan List and Mailing Services ("Titan"), a Florida based marketing services company.  The sham split invoices associated with this kickback appear as **Exhibit 4**.

63.     The sham invoices state that Titan designs, produces and mails 6,000 Sierra Pacific solicitations to potential borrowers located in Maryland and Virginia.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered

interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state and delivered to the potential borrower in another state.

64.   All Star makes the kickback payment by transmission over interstate wires, with All Star transmitting the kickback payment from its bank in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida.  The e-mail confirming the wire payment is attached as **Exhibit 5**.

65.   A few months later, in May 2012, All Star and Sierra Pacific conspire and agree to fix prices for title and settlement services for loans assigned and referred to All Star by the Sierra Pacific White Marsh Branch at $1,750 including title insurance for loans in licensed states, and $1,000 plus title insurance for loans in unlicensed states (that is, those states in which All Star is not a licensed title and settlement services company and must work with a cooperating title company).  *See* **Exhibit 6**, 5/4/12 Client Fees Spreadsheet. These prices are approximately $300 higher than the prices All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages incurred by Sierra Pacific borrowers assigned and referred to All Star by the Sierra Pacific White Marsh Branch.

66.   On May 16, 2012, All Star pays a $3,072.50 kickback to Sierra Pacific by and through Titan.  The sham split invoices associated with this kickback appear as **Exhibit 7**.

67.   The sham split invoices state that Titan designs, produces and mails 7,500 Sierra Pacific solicitations to potential borrowers located in Maryland and Virginia.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state and delivered to the potential borrower in another state.

68.     All Star makes the kickback payment by transmission over interstate wires, with All Star transmitting the kickback payment from All Star's bank in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida.  The 5/16/12 e-mail confirming the wire payment is attached as **Exhibit 8**.

69.     Two months later, on July 11, 2012, All Star pays a $4,010.97 kickback to Sierra Pacific by and through Titan.  The sham split invoices and payment record appear as **Exhibit 9**.

70.     The sham split invoices state that Titan designs, produces and mails 10,000 Sierra Pacific solicitations to potential borrowers located in Maryland, Virginia and Pennsylvania. Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state and delivered to the potential borrower in another state.

71.     All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida.  *See* **Exhibit 9**.

72.     Two months later, September 12, 2012, All Star pays a $2,138.50 kickback to Sierra Pacific by and through Titan.  The sham split invoices and payment record appear as **Exhibit 10**.

73.     The sham split invoices state that Titan designs, produces and mails 5,000 Sierra Pacific borrower solicitations.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed

in the mail in one state – Florida – and delivered to the potential borrower in another state.

74.     All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from All Star's bank in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida.  *See* **Exhibit 10**.

75.     The next month, on October 17, 2012, All Star pays a $3,045.76 kickback to Sierra Pacific by and through Titan.  The sham split invoices and payment record associated with this kickback appear as **Exhibit 11**.

76.     The sham split invoices state that Titan designs, produces and mails 6,000 Sierra Pacific borrower solicitations.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

77.     All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from its offices in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida.  *See* **Exhibit 11**.

78.     The next month, on November 28, 2012, All Star pays a $2,753.41 kickback to Sierra Pacific by and through Titan.  The sham split invoices and payment record associated with this kickback appear as **Exhibit 12**.

79.     The sham split invoices state that Titan designs, produces and mails 6,598 Sierra Pacific borrower solicitations.  Based on the postage charged on the sham invoice, Plaintiffs

believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

80.     All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from its offices in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida. *See* **Exhibit 12**.

81.     About six weeks later, on January 17, 2013, All Star pays a $3,278.60 kickback to Sierra Pacific by and through Titan.  The sham split invoices and payment record associated with this kickback appear as **Exhibit 13**.

82.     The sham split invoices state that Titan designs, produces and mails 8,000 Sierra Pacific borrower solicitations over three weeks.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

83.     All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from its offices in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida. *See* **Exhibit 13**.

84.     The next month, on February 13, 2013, All Star pays a $3,679.03 kickback to Sierra Pacific by and through Titan.  The sham split invoices and payment record associated with this kickback appear as **Exhibit 14**.

85.     The sham invoices state that Titan designs, produces and mails 9,015 Sierra Pacific borrower solicitations over four weeks.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

86.     All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from its offices in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida.  *See* **Exhibit 14**.

87.     Two months later, April 23, 2013, All Star pays a $3,828.59 kickback to Sierra Pacific by and through Titan.  The sham split invoices and payment record associated with this kickback appear as **Exhibit 15**.

88.     The sham invoices state that Titan designs, produces and mails 9,064 Sierra Pacific borrower solicitations over four weeks.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

89.     All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from its offices in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida.  *See* **Exhibit 15**.

90.     Four months later, August 14, 2013, All Star pays a $3,146.00 kickback to Sierra Pacific by and through Titan.  The sham split invoices and payment record associated with this kickback appear as **Exhibit 16**.

91.     The sham split invoices state that Titan designs, produces and mails 9,000 Sierra Pacific borrower solicitations over four weeks.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

92.     All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from its offices in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida.  *See* **Exhibit 16**.

93.     The next month, on September 22, 2014, All Star pays a $2,917.20 kickback to Sierra Pacific by and through Titan.  The sham split invoices and payment record associated with this kickback appear as **Exhibit 17**.

94.     The sham split invoices state that Titan obtains the data, produces and mails 8,000 Sierra Pacific borrower solicitations.   Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

95.     All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from its

offices in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida. *See* **Exhibit 17**.

96.     All Star's records indicate that Sierra Pacific and All Star agree to and perform the Kickback and Cartel Agreements through at least August 2015. By this time, Sierra Pacific and All Star fix prices for title and settlement services charged borrowers assigned and referred to All Star from the Sierra Pacific White Marsh Branch at: (i) $1,000 plus title insurance for purchases, (ii) $695 plus title insurance for purchases on properties located in Pennsylvania; (iii) $800 plus title insurance for refinances, and (iv) $695 plus title insurance for refinances on properties located in Pennsylvania. *See* 8/5/15 Settlement Fees Sheet, attached as **Exhibit 18**.

97.     These prices are between $75-205 higher than the prices All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages incurred by Sierra Pacific borrowers assigned and referred to All Star by the Sierra Pacific White Marsh Branch.

98.     The Sierra Pacific White Marsh Branch assigned and referred more than 300 loans to All Star involving residential mortgage loans, refinances or reverse mortgages secured by real property across at least four states.

**B.      Sierra Pacific's Participation in the All Star Scheme by and through the Sierra Pacific Bel Air Branch**

99.     Beginning in August 2011 through present, Todd Dennis ("Dennis") is a branch manager and licensed mortgage originator employed by Sierra Pacific at a branch located at 539 Rock Spring Road, Bel Air, MD 21014 ("Sierra Pacific Bel Air Branch").

100.    By August 2013, All Star and Sierra Pacific conspire and agree to fix prices for title and settlement service associated with Sierra Pacific loans assigned and referred from the

Sierra Pacific Bel Air Branch at $1,000 plus title insurance.  *See* 8/12/13 E-mail attached as **Exhibit 19**.

101.   In accordance with the Price Fixing and Kickback Agreements and in furtherance of the All Star Scheme, on August 12, 2013, All Star pays a $1,534.17 kickback to Sierra Pacific by and through Titan.  The sham split invoices and payment record associated with this kickback appear as **Exhibit 20**.

102.   The sham split invoices state that Titan produces and mails 8,000 Sierra Pacific borrower solicitations.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

103.   All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from its offices in Maryland and Sierra Pacific receiving the payment, by and through Titan, in Florida.  *See* **Exhibit 20**.

104.   On August 14, 2013, All Star communicates with an account representative at Titlehound, the software company All Star uses to generate "pre-HUDS" and other loan documents provided by All Star and Sierra Pacific to borrowers and on which All Star and Sierra Pacific intend borrowers to rely.  All Star causes its Price Fixing and Minimum Fee Agreement with the Sierra Pacific Bel Air Branch of $1,000 plus title insurance to be programmed into the software so that the Cartel Agreements are automatically performed when the software used by All Star and Sierra Pacific.  *See* 8/14/13 e-mail, attached as **Exhibit 21**.

105.    In doing so, All Star and Sierra Pacific also agreed that the $1,000 in title and settlement service fees are to be allocated only to the title exam and abstract fee. *See id.*

106.    These fixed prices are between $100-300 more than All Star is charging other Participating Lenders, which amount represents the actual damages sustained by Sierra Pacific borrowers assigned and referred to All Star by the Sierra Pacific Bel Air Branch.

107.    Sierra Pacific and All Star agree to and perform the Kickback by and through the Sierra Pacific Bel Air Branch through at least August 2015, and, on information and belief, longer.

108.    Sierra Pacific and All Star agree to and perform the Cartel Agreements by and through the Sierra Pacific Bel Air Branch through at least August 2015, and, on information and belief, longer.  *See* **Exhibit 18**, 8/5/15 Settlement Fees Sheet.

**C.    Sierra Pacific's Participation in the All Star Scheme by and through the Sierra Pacific Westminster Branch**

109.    Beginning in May 2012 through August 2015, Byron Zonin ("Zonin") is a branch manager and licensed mortgage originator employed by Sierra Pacific at a branch located at 15 East Main Street, #28, Westminster, MD 21157 ("Sierra Pacific Westminster Branch").

110.    On or about January 11, 2013, All Star pays a $2,183.25 kickback to Sierra Pacific by and through MailerLeads, LLC ("MailerLeads"), a Ohio-based direct mail and leads company.  The sham invoice and e-mail regarding payment associated with this kickback appears as **Exhibit 22**.

111.    The sham invoices state that MailerLeads produces and mails four drops of 1,250 each Sierra Pacific solicitations to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe, and therefore aver, that these Sierra Pacific solicitations

are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Sierra Pacific solicitation is placed in the mail in one state – Ohio – and delivered to the potential borrower in another state.

112.    All Star makes the kickback payment by transmission over interstate wires in the form of a credit card authorization form, with All Star transmitting the kickback payment from its offices in Maryland and Sierra Pacific receiving the payment, by and through MailerLeads, in Ohio. *See* **Exhibit 22**.

113.    Pursuant to the Kickback, Cartel, and Minimum Fee Agreements, All Star and Sierra Pacific also conspire and agree to fix prices in relation to loans assigned and referred to All Star by the Sierra Pacific Westminster Branch to "$850.00 plus title insurance". *See* 1/11/13 e-mails between All Star attached as **Exhibit 23**.

114.    These fixed prices are between $50-150 higher than the prices All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages incurred by Sierra Pacific borrowers assigned and referred to All Star by the Sierra Pacific Westminster Branch.

115.    After performing the Kickback and Cartel Agreements for more than a year, in September 2014, All Star and Sierra Pacific conspire and agree to increase the fixed prices in relation to loans assigned and referred to All Star by Zonin and the Sierra Pacific Westminster Branch to "$895.00 plus title insurance". *See* 9/3/14 Dan's Clients Fees Chart, attached as **Exhibit 24**.

116.    These increased prices are between $95-195 higher than the prices All Star is charging other Participating Lenders, which amount represents the minimum amount of actual damages incurred by Sierra Pacific borrowers assigned and referred to All Star by the Sierra Pacific Westminster Branch.

117.   Sierra Pacific and All Star perform the Kickback by and through the Sierra Pacific Westminster Branch through at least August 2015, and, on information and belief, longer.

118.   Sierra Pacific and All Star perform the Cartel Agreements by and through the Sierra Pacific Westminster Branch through at least August 2015, and, on information and belief, longer.   *See* **Exhibit 18**, 8/5/15 Settlement Fees Sheet.

119.   Based on the continuing pattern of practice between All Star and Sierra Pacific, Plaintiffs believe, and therefore aver, that All Star and Sierra Pacific conspire to and fix prices for title and settlement services associated with loans assigned and referred to All Star by additional known and unknown Sierra Pacific loan officers in furtherance and performance of the All Star Lender Cartel and the Cartel Agreements.

120.   Based on the continuing pattern of practice between All Star and Sierra Pacific, Plaintiffs believe, and therefore aver, that All Star pays, and Sierra Pacific receives, kickbacks in exchange for Sierra Pacific's assignment and referral of loans from additional known and unknown Sierra Pacific loan officers in furtherance and performance of the Kickback Agreement.

121.   Based on the continuing pattern of practice between All Star and Sierra Pacific, Plaintiffs believe, and therefore aver, that All Star pays kickbacks to Sierra Pacific by and through other third party marketing companies in addition to those identified herein.

122.   Based on the continuing pattern of practice between All Star and Sierra Pacific, Plaintiffs believe, and therefore aver, that All Star and Sierra Pacific use and cause to be used U.S. mail and/or interstate wires to identify and solicit borrowers that are the currency of the Kickback and Cartel Agreements between All Star and Sierra Pacific.

123.   As a result of the Kickback and Cartel Agreements, and Sierra Pacific's participation in the All Star Lender Cartel and wider All Star Scheme, Sierra Pacific borrowers, including

Plaintiffs and alleged Class Members, are harmed because they are defrauded into being charged and paying higher and supracompetitive prices for title and settlement services than they would have been charged and paid without the Kickback and Cartel Agreements, are denied kickback free title and settlement services, and were denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

124.    No title services are provided by Sierra Pacific, or any Sierra Pacific employee and/or agent, associated with the receipt and acceptance of the kickbacks.  The payment by All Star and the receipt and acceptance by Sierra Pacific of the kickbacks are made solely for the assignment and referral of Sierra Pacific borrowers to All Star.

## FACTUAL ALLEGATIONS RELATED TO
## THE INDIVIDUAL CLASS REPRESENTATIVES

125.    Plaintiffs' transactions and the course of events thereafter exemplify the working of the Kickback and Cartel Agreements and are typical of all alleged Class Members' transactions.

### A.    The Bailey Plaintiffs' Loan

126.    In or about November 2011, Plaintiffs David K. and Debra L. Bailey ("Bailey Plaintiffs") obtained a residential mortgage loan from Sierra Pacific through Todd Asplen, a loan officer employed by Sierra Pacific in the Sierra Pacific White Marsh Branch, in relation to the refinancing of their residential real property and principal residence located at 956 Edmund Street, Aberdeen, MD 21001.  The Bailey Plaintiffs' loan settled on November 2, 2012 with Plaza Home Mortgage, Inc. as the lender.

127.    The Bailey Plaintiffs believe, and therefore aver, that Asplen assigned and referred the Bailey Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and

as quid pro quo for the $2,138.50 kickback All Star paid and Sierra Pacific received and accepted on September 12, 2012 by and through Titan, thereby performing the Kickback and Cartel Agreements, depriving the Bailey Plaintiffs of their choice of title and settlement service provider, and denying the Bailey Plaintiffs kickback-free title and settlement services. *See* **Exhibit 10**.

128.   The Bailey Plaintiffs believe, and therefore aver, that All Star charges the Bailey Plaintiffs approximately $1,750 for title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.   The Bailey Plaintiffs are not in possession of their HUD-1 Settlement Statement, and believe that document is in the sole possession of Sierra Pacific.

129.   The Bailey Plaintiffs believe, and therefore aver, the price for title and settlement service fees All Star charges the Bailey Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

130.   The Bailey Plaintiffs believe, and therefore aver, that these title and settlement service fees included the approximately $300 Kickback Overcharge described in ¶ 65, which is the minimum amount of the Bailey Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

131.   The Bailey Plaintiffs believe, and therefore aver, that they paid for these charges when All Star disbursed proceeds from the Bailey Plaintiffs' loan in payment of these title and settlement service charges.

132.   The Bailey Plaintiffs believe, and therefore after, that Sierra Pacific benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to the Bailey Plaintiffs' loan because Sierra Pacific financed the fees into their loan and thereby earns interest on the fees.

133.    As a direct and proximate result of the Kickback and Cartel Agreements, and Sierra Pacific's performance of these agreements, the Bailey Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

134.    As a direct and proximate result of the Kickback and Cartel Agreements, the Bailey Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $300 and, on information and belief, additional amounts.

**B.    The Batton Plaintiffs' Loan**

135.    In or about September 2015, Plaintiffs William C. and Heller Batton ("Batton Plaintiffs") obtained a residential mortgage loan from Sierra Pacific through David Brown, a loan officer employed by Sierra Pacific in the Sierra Pacific White Marsh Branch,  in relation to the refinancing of their residential real property and principal residence located at 2600 Laurel Brook Road, Fallston, MD 21047.   The Batton Plaintiffs' loan settled on September 25, 2015 with Sierra Pacific as the lender.

136.    The Batton Plaintiffs believe, and therefore aver, that Brown assigned and referred the Batton Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the $2,917.20 kickback All Star paid to Sierra Pacific on September

22, 2014 by and through Titan, thereby performing the Kickback and Cartel Agreements, depriving the Batton Plaintiffs of their choice of title and settlement service provider, and denying the Batton Plaintiffs kickback-free title and settlement services.

137.     All Star charges the Batton Plaintiffs $1,730.04 in total title and settlement service fees, broken out by $585.04 for title insurance, $895.00 for title exam and settlement fees, and $250.00 for a "Sub Fee", thereby performing the Price Fixing and Minimum Fee Agreements. *See* Batton Plaintiffs' HUD-1, attached hereto as **Exhibit 25**. The price for title and settlement service fees All Star charges the Batton Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

138.     These title and settlement service fees included the between $75-205 Kickback Overcharge described in ¶¶ 96-97, which is the minimum amount of the Batton Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

139.     The Batton Plaintiffs paid for these charges when All Star disbursed proceeds from the Batton Plaintiffs' loan in payment of these title and settlement service charges, as reflected on the Batton Plaintiffs' HUD-1. *See* **Exhibit 25**.

140.     The Batton Plaintiffs believe, and therefore aver, that Sierra Pacific benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to the Batton Plaintiffs' loan because Sierra Pacific financed the fees into their loan and thereby earns interest on the fees.

141.     As a direct and proximate result of the Kickback and Cartel Agreements, and Sierra Pacific's performance of these agreements, the Batton Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being

charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

142.    As a direct and proximate result of the Kickback and Cartel Agreements, the Batton Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $75-205 and, on information and belief, additional amounts.

### C.    Gregory Dopkowski's Loan

143.    In or about October 2015, Plaintiff Gregory P. Dopkowski, Sr. ("Plaintiff Dopkowski") obtained a residential mortgage loan from Sierra Pacific through David Brown, a loan officer employed by Sierra Pacific in the Sierra Pacific White Marsh Branch, in relation to the refinance of his residential real property and principal residence located at 311 Lorraine Avenue, Essex, MD 21221.  Plaintiff Dopkowski's loan settled on October 26, 2015 with Sierra Pacific as the lender.

144.    Plaintiff Dopkowski believes, and therefore avers, that Brown assigned and referred Plaintiff Dopkowski's loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the $2,917.20 kickback All Star paid to Sierra Pacific on September 22, 2014 by and through Titan, thereby performing the Kickback and Cartel Agreements, depriving Plaintiff Dopkowski of his choice of title and settlement service provider, and denying Plaintiff Dopkowski kickback-free title and settlement services.

145.    Plaintiff Dopkowski believes, and therefore avers, that that All Star charges Plaintiff Dopkowski approximately $800 for his settlement services, title exam and abstract fees, plus an amount for title insurance, thereby performing the Price Fixing and Minimum Fee Agreements.   Plaintiff Dopkowski is not in possession of his HUD-1 Settlement Statement, and believes that document is in the sole possession of Sierra Pacific.

146.    Plaintiff Dopkowski believes, and therefore avers, that the price for title and settlement service fees All Star charges Plaintiff Dopkowski are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

147.    Plaintiff Dopkowski believes, and therefore avers, that these title and settlement service fees are approximately $75-205 higher than the prices All Star is charging other Participating Lenders as alleged in ¶¶ 96-97, which is the minimum amount of Plaintiff Dopkowski's actual damages resulting from the All Star Scheme and Cartel Agreements.

148.    Plaintiff Dopkowski believes, and therefore avers, that he paid for these charges when All Star disbursed proceeds from Plaintiff Dopkowski's loan in payment of these title and settlement service charges.

149.    Sierra Pacific benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to Plaintiff Dopkowski's loan because Sierra Pacific financed the fees into his Sierra Pacific loan and thereby earns interest on the fees.

150.    As a direct and proximate result of the Kickback and Cartel Agreements, and Sierra Pacific's performance of these agreements, Plaintiff Dopkowski was harmed because he was: (i) charged and paid more for settlement services than he would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial

evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

151.   As a direct and proximate result of the Kickback and Cartel Agreements, Plaintiff Dopkowski was charged and paid more for the title and settlement services than he would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $75-205 and, on information and belief, additional amounts.

   **D.     The Patterson Parents Plaintiffs' Loan**

152.   In or about September 2015, Plaintiffs Samuel and Beverly Patterson, Jr. ("Patterson Parents Plaintiffs") obtain a residential mortgage loan from Sierra Pacific through David Brown, a loan officer employed by Sierra Pacific in the Sierra Pacific White Marsh Branch, in relation to the refinancing of their residential real property and principal residence located at 4000 Balmoral Circle, Pikesville, MD 21208.  The Patterson Parents Plaintiffs' loan settled on September 16, 2015 with Sierra Pacific as the lender.

153.   The Patterson Parents Plaintiffs believe, and therefore aver, that Brown assigned and referred the Patterson Parents Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the $2,917.20 kickback All Star paid to Sierra Pacific on September 22, 2014 by and through Titan, thereby performing the Kickback and Cartel Agreements, depriving the Patterson Parents Plaintiffs of their choice of title and settlement service provider, and denying the Patterson Parents Plaintiffs kickback-free title and settlement services.

154.   All Star charges the Patterson Parents Plaintiffs $1,048.76 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.  *See* Patterson Parents Plaintiffs' HUD-1, attached as **Exhibit 26**.  The price for title and

settlement service fees All Star charges the Patterson Parents Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

155.  These title and settlement service fees included the between $75-205 Kickback Overcharge described in ¶¶ 96-97, which is the minimum amount of the Patterson Parents Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

156.  The Patterson Parents Plaintiffs believe, and therefore aver, that they paid for these charges when All Star disbursed proceeds from their loan in payment of these title and settlement service charges, as reflected on the Patterson Parents Plaintiffs' HUD-1. *See* **Exhibit 26**.

157.  The Patterson Parents Plaintiffs believe, and therefore after, that Sierra Pacific benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to the Patterson Parents Plaintiffs' loan because Sierra Pacific financed the fees into their Sierra Pacific loan and thereby earns interest on the fees.

158.  As a direct and proximate result of the Kickback and Cartel Agreements, and Sierra Pacific's performance of these agreements, the Patterson Parents Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

159.  As a direct and proximate result of the Kickback and Cartel Agreements, the Patterson Parents Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $75-205 and, on information and belief, additional amounts.

**E.    The Patterson Plaintiffs' Loan**

160.  In or about June 2015, Plaintiffs Raheim and Syretta Patterson ("Patterson Plaintiffs") obtained a residential mortgage loan from Sierra Pacific through David Brown, a loan officer employed by Sierra Pacific in the Sierra Pacific White Marsh Branch, in relation to the refinancing of their residential real property and principal residence located at 3636 Clifmar Road, Windsor Mill, MD 21244.  The Patterson Plaintiffs' loan settled on June 10, 2015 with Sierra Pacific as the lender.

161.  The Patterson Plaintiffs believe, and therefore aver, that Brown assigns and refers the Patterson Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the $2,917.20 kickback All Star paid to Sierra Pacific on September 22, 2014 by and through Titan, thereby performing the Kickback and Cartel Agreements, depriving the Patterson Plaintiffs of their choice of title and settlement service provider, and denying the Patterson Plaintiffs kickback-free title and settlement services.

162.  The Patterson Plaintiffs believe, and therefore aver, that All Star charged the Patterson Plaintiffs approximately $800 for their settlement services, title exam and abstract fees, plus title insurance, thereby performing the Price Fixing and Minimum Fee Agreements. The Patterson Plaintiffs are not in possession of their HUD-1 Settlement Statement, and believe that document is in the sole possession of Sierra Pacific.

163.   The Patterson Plaintiffs believe, and therefore aver, the price for title and settlement service fees All Star charges the Patterson Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

164.   The Patterson Plaintiffs believe, and therefore aver, that these title and settlement service fees are approximately $75-205 higher than the prices All Star is charging other Participating Lenders as alleged in ¶¶ 96-97, which is the minimum amount of the Patterson Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

165.   The Patterson Plaintiffs pay for these charges when All Star disburses proceeds from the Patterson Plaintiffs' loan in payment of these title and settlement service charges.

166.   The Patterson Plaintiffs believe, and therefore after, that Sierra Pacific benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to the Patterson Plaintiffs' loan because Sierra Pacific financed the fees into their Sierra Pacific loan and thereby earns interest on the fees.

167.   As a direct and proximate result of the Kickback and Cartel Agreements, and Sierra Pacific's performance of these agreements, the Patterson Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

168.   As a direct and proximate result of the Kickback and Cartel Agreements, the Patterson Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $75-205 and, on information and belief, additional amounts.

F.   **The Welsh Plaintiffs' Loan**

169.   In or about February 2015, Plaintiffs Arnold N. and Lois Welsh, Jr. ("Welsh Plaintiffs") obtain a residential mortgage loan from Sierra Pacific through Todd Asplen, a loan officer employed by Sierra Pacific in the Sierra Pacific White Marsh Branch, in relation to the refinancing of their residential real property and principal residence located at 2259 Ridgemont Drive, Finksburg, MD 21048.  The Welsh Plaintiffs' loan settled on February 23, 2015 with Sierra Pacific as the lender.

170.   The Welsh Plaintiffs believe, and therefore aver, that Asplen assigned and referred the Welsh Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the $2,917.20 kickback All Star paid to Sierra Pacific on September 22, 2014 by and through Titan, thereby performing the Kickback and Cartel Agreements, depriving the Welsh Plaintiffs of their choice of title and settlement service provider, and denying the Welsh Plaintiffs kickback-free title and settlement services.

171.   All Star charges the Welsh Plaintiffs $1,647.84 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.  *See* Welsh Plaintiffs' HUD-1, attached as **Exhibit 27**.  The price for title and settlement service fees All Star charges the Welsh Plaintiffs are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

36

172. These title and settlement service fees included the between $75-205 Kickback Overcharge described in ¶¶ 96-97, which is the minimum amount of the Welsh Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

173. The Welsh Plaintiffs believe, and therefore aver, that they paid for these charges when All Star disbursed proceeds from their loan in payment of these title and settlement service charges, as reflected on the Welsh Plaintiffs' HUD-1.  *See* **Exhibit 26**.

174. The Welsh Plaintiffs believe, and therefore after, that Sierra Pacific benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to the Welsh Plaintiffs' loan because Sierra Pacific financed the fees into their Sierra Pacific loan and thereby earns interest on the fees.

175. As a direct and proximate result of the Kickback and Cartel Agreements, and Sierra Pacific's performance of these agreements, the Welsh Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

176. As a direct and proximate result of the Kickback and Cartel Agreements, the Welsh Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $75-205 and, on information and belief, additional amounts.

**FACTUAL ALLEGATIONS RELATED TO LIMITATIONS**

177.   Essential to the All Star Scheme, Sierra Pacific, as well as other members of the All Star Lender Cartel, and All Star undertake affirmative acts that fraudulently conceal the Kickback and Cartel Agreements, the resulting kickbacks and fixed prices, and the actual injury and damages to borrowers, including Plaintiffs and alleged Class Members.

**I.**      **All Star and Sierra Pacific Launder Kickbacks through Third Party Marketing Companies and Use Sham Invoice and Payment Records.**

178.   As described in ¶ 27 above, Sierra Pacific and All Star chose to conceal the fact and payment of kickbacks by laundering kickbacks through third party marketing companies.

179.   As described in ¶¶ 29-34, Sierra Pacific and All Star further chose to conceal the illegal kickbacks and Kickback Agreement through the creation of sham invoices and sham payment records.

180.   These sham invoices and payment records create an ongoing false record that conceals and prevents discovery of the fact that any thing of value is exchanged between Sierra Pacific and All Star related to the assignment and referral of Sierra Pacific loans, including Plaintiffs' loans, the actual payment and receipt and acceptance of illegal kickbacks, and Sierra Pacific's coordinated business relationship with All Star.

**II.**     **Sierra Pacific and All Star's Fraudulent Marketing Representations**

181.   To further conceal the Price Fixing, Minimum Fee Agreements, the Kickback Agreement, and the resulting supracompetitive prices charged to Sierra Pacific borrowers for title and settlement services, Sierra Pacific and All Star make false representations to borrowers in marketing materials.

182.   In direct mail solicitations of borrowers, Sierra Pacific represents that a borrower can "Save an additional 30-40% of your title fees with All Star Title!" and that All Star is

Sierra Pacific's "Preferred Title Company" *See, e.g.*, 9/12/12 and 9/22/14 invoice mailers, attached as **Exhibits 28** and **29**.

183.    These representations are false because: (i)  Sierra Pacific does not recognize the designation of a "preferred" title company; (ii)  a borrower can not save any percentage of title fees with All Star, but instead is charged higher and supracompetitive fees under the Price Fixing and Minimum Fee Agreements; (iii) the reason the Sierra Pacific broker wants a borrower to use All Star is for the Sierra Pacific broker to obtain kickbacks and to perform its obligations under the Cartel Agreements, not because the borrower will receive lower fees; and (iv) any borrower responding to the direct mail solicitation does not "choose" All Star, but will be assigned and referred by Sierra Pacific to All Star.

184.    Plaintiffs believe, and therefore aver, that Sierra Pacific makes similar false representations by other means, e.g. as in telemarketing phone calls with borrowers.

### III.    Sierra Pacific and All Star's  False Allocation of Fees and APR Manipulation

185.    The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage. While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes both the interest rate of the loan plus certain other lender fees, such as origination fees, discount points and some closing costs, including some title and settlement service fees.  The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate.  Lenders are required to report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

186.    The title and settlement service fees that are excluded in the APR calculation are defined by TILA.  12 C.F.R. § 1026.4(c). Because some fees are excluded from the APR (and others are not), title and settlement service companies and lenders can manipulate – and falsely minimize – the APR by falsely allocating amounts charged for title and settlement services to those categories of fees that are excluded from the APR calculation.

187.    As a regular and continuing business practice, Sierra Pacific and All Star allocate the charges for title and settlement services associated with a borrower's loan only to those categories of title services not included in the APR, thereby falsely minimizing the APR reported on Sierra Pacific borrowers' loan documents and required federal disclosures.

188.    For example, "fees for title examination" and "abstract of title" are excluded from the APR calculation – see, 12 C.F.R. § 1026.4(c)(7)(i) – while a settlement or closing fee, or an application signing fee, is a settlement service cost required to be included in the APR calculation.  See 12 C.F.R. § 1026.4(a)(1)(i). By allocating the charges associated to conducting a settlement or closing with a borrower to the category of "title exam" or "abstract" the result would be a false, and falsely minimized, APR.

189.    All Star claims the false allocation of fees and manipulation of the APR as a regular business practice as early as 2011 and at least through October, 2015, allocating all charges for title and settlement service to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the APR.  *See, e.g.*, June 6, 2011 E-mail, attached as **Exhibit 30**; September 24, 2015 E-mail l, attached as **Exhibit 31**; October 6, 2015 E-mail, attached as **Exhibit 32**.

190.     Sierra Pacific participates in and ratifies this false allocation of fees.  *See* **Exhibit 21**, 8/14/13 All Star e-mail with Titlehound. Based on this continuing pattern of practice, Plaintiffs believe, and therefore aver, that All Star and Sierra Pacific engage in the false

allocation and manipulation of the APR throughout the time period Sierra Pacific is participating in the All Star Scheme.

191.  For example, despite conducting a settlement or closing with each Sierra Pacific borrower, All Star and Sierra Pacific choose to not allocate any amount of All Star's charges associated with a borrower's loan to "settlement or closing fee" because that charge is included in the APR.  Instead, All Star and Sierra Pacific allocate all charges, including that portion attributable to conducting a settlement or closing, to "Title Exam" or "Abstract", which are excluded from the APR.  *See* **Exhibits 30-32**.

192.  Sierra Pacific and All Star's choice to falsely allocate fees resulted in the fraudulent reporting of false APR's and the false, and falsely minimized, representation of the cost of the loan to the Sierra Pacific borrower.

193.  Sierra Pacific and All Star's choice to falsely allocate fees and fraudulently report these false allocations in borrowers' loan documents concealed from Sierra Pacific borrowers the supracompetitive pricing of title and settlement services resulting from the Kickback and Cartel Agreements and prevented borrowers from discovering the supracompetitive nature of the pricing through comparison to Sierra Pacific's and All Star's competitors.

194.  As a regular business practice, All Star used various software programs, including "Titlehound", to produce borrower loan documents, including documents reporting the APRs associated with a loan.  All Star caused this software, including Titlehound, to be programmed to make these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce Sierra Pacific loan documents to present to borrowers and on which Sierra Pacific and All Star intended borrowers rely. *See* **Exhibits 1** and **21**.

195.  Sierra Pacific and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently concealed from Sierra Pacific borrowers the coordinated business relationship between Sierra Pacific and All Star under the Kickback and Cartel Agreements, the supracompetitive and higher prices for title and settlement services resulting from the Kickback and Cartel Agreements, and affirmatively prevented Sierra Pacific borrowers from discovering their injuries resulting therefrom.

**IV.    False Representations in Sierra Pacific Borrowers' Loan Documents**

196.  In addition to false representations in marketing communications to borrowers and the choice to misrepresent the actual APR's through the intentionally classifying some of All Star's charges as non-APR related charges, Sierra Pacific and All Star choose to make false representations on borrowers' loan documents.

197.  At all relevant times, federal law required Sierra Pacific, as a lender, to provide a "Good Faith" Estimate to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b).

198.  Block 4 of the "Good Faith" Estimate is to state only the charges for "title services and lender's title insurance".

199.  As a regular pattern of practice, Sierra Pacific falsely includes in Block 4 charges that are not title services and lender's title insurance including flat fee overcharges associated with the Price Fixing and Minimum Fee Agreements.

200.  Sierra Pacific's choice to falsely include these charges in Block 4 of the "Good Faith" Estimate conceals from borrowers: (i) the charges and amounts associated with the surcharges and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business relationship between Sierra Pacific and All Star under the Kickback and Cartel Agreements.

201. In addition to the GFE, federal law, at all relevant times, required each borrower to receive a HUD- Settlement Statement at the closing or settlement of a loan. The settlement agent produces the HUD-1, but federal regulations require the lender to provide to the settlement agent all information appearing in the HUD-1 statement.

202. Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

203. As a continuing pattern and regular business practice, Sierra Pacific and All Star choose and cause the false allocation of fees described in ¶¶ 185-195 to repeat and appear on Sierra Pacific borrowers' HUD-1 statements in Section 1100.

204. As a continuing pattern  and regular business practice, Sierra Pacific omits and fails to describe anywhere on a borrower's HUD-1 statement the amount of the  kickback received by Sierra Pacific related to the borrower's loan or the fact that All Star has  paid a kickback to Sierra Pacific for the assignment and referral of the borrower's loan.  Sierra Pacific is required to report the kickback on Line 801 or Line 808 of the HUD-1.

205. As a continuing pattern of practice, Sierra Pacific omits and fails to describe anywhere on a borrower's HUD-1 statement that the borrower is being charged or the amount of any Kickback Overcharge, Attorney Fee Surcharge, or other flat fee associated with the fixed prices under the Cartel Agreements.  Sierra Pacific is required to report these amounts in Section 1100 or Section 1300 of the HUD-1.

206. These false representations and omissions, presented to Sierra Pacific borrowers by All Star as Sierra Pacific's agent at closing, fraudulently conceals: (i) the charges and amounts associated with the surcharges, overcharges, and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the

43

coordinated business relationship between Sierra Pacific and All Star under the Kickback and Cartel Agreements.

207.   Individually and collectively, Sierra Pacific and All Star's  affirmative acts of concealment –  the laundering of kickbacks through third party marketing companies, the related creation of shame invoice and payment records, false marketing statements, false allocation of fees and manipulation of the reported APR, and misrepresentations and omissions on borrowers "Good Faith" Estimates, HUD-1s, and other loan documents – are outside the control of Sierra Pacific borrowers, including Plaintiffs and Class Members, and are in the sole control of, and the result of choices by, Sierra Pacific and All Star.

### V.     Plaintiffs' Reasonable Diligence

208.   As a result of the fraudulent concealments by Sierra Pacific and All Star, the Bailey Plaintiffs, the Batton Plaintiffs, Gregory Dopkowski, the Patterson Parents Plaintiffs, the Patterson Plaintiffs, and the Welsh Plaintiffs (and, upon information and belief, all alleged Class Members) had no actual notice before, at or after the closing of their Sierra Pacific loans of the illegal kickbacks, the exchange of any thing of value between Sierra Pacific and All Star, the Price Fixing and Minimum Fee Agreements or the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of Sierra Pacific or All Star under the Kickback and Cartel Agreements.

209.   Plaintiffs exercised reasonable diligence before, during and after the closing of their loans.

A.       **The Bailey Plaintiffs' Reasonable Diligence**

210.    As a result of the fraudulent concealments by Sierra Pacific and All Star, the Bailey
        Plaintiffs have no actual notice before, at or after the closing of their Sierra Pacific loan
        of the illegal kickbacks, the exchange of any thing of value between Sierra Pacific and
        All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive
        nature of the prices charged for title and settlement services, or the coordinated business
        relationship of Sierra Pacific or All Star under the Kickback and Cartel Agreements.

211.    The Bailey Plaintiffs exercise reasonable diligence before, during and after the closing of
        their loan.

212.    The Bailey Plaintiffs receive loan documents prepared by Sierra Pacific in advance of
        their closing and review those loan documents.

213.    The Bailey Plaintiffs believe, and therefore aver, that their pre-closing loan documents
        include the Bailey Plaintiffs' "Good Faith" Estimate which they believe, and therefore
        aver, Sierra Pacific prepared.  The Bailey Plaintiffs are not in possession of the "Good
        Faith" Estimate issued regarding their Sierra Pacific refinance and believe that document
        is in the sole possession of Sierra Pacific.

214.    The Bailey Plaintiffs believe, and therefore aver, that their "Good Faith" Estimate does
        not include any description or statement of the coordinated business relationship between
        Sierra Pacific and All Star, or the fact that All Star has paid anything of value for Sierra
        Pacific's assignment and referral of the Bailey Plaintiffs' loan to All Star.

215.    The Bailey Plaintiffs believe, and therefore aver, that their "Good Faith" Estimate does
        not include any description or statement of the coordinated business relationship between
        Sierra Pacific and All Star contains the fraudulent representations and omission described
        in ¶¶ 197-200 above.

45

216. The Bailey Plaintiffs believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to the Bailey Plaintiffs' refinance.

217. The Bailey Plaintiffs believe, and therefore aver, that their pre-closing documents reflect Sierra Pacific and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 185-195.

218. The false statements and omissions made in the Bailey Plaintiffs' pre-closing loan documents are made for the purposes of concealing, did so conceal from them, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Bailey Plaintiffs' loan, and the supracompetitive nature of prices the Bailey Plaintiffs were charged for title and settlement services.

219. As is reasonable under the circumstances, the Bailey Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Bailey Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star; (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of their Sierra Pacific loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

220. The Bailey Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, Sierra Pacific requires the Bailey Plaintiffs to participate in a closing, and they attend and fully participate in the required closing.

221.   The Bailey Plaintiffs believe, and therefore aver, that at the closing of their loan, they receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Bailey Plaintiffs are not in possession of the documents received at their closing, including their HUD-1 issued regarding their Sierra Pacific loan, and believe that document is in the sole possession of Sierra Pacific.

222.   The Bailey Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, do not contain a description or statement of the coordinated business relationship between Sierra Pacific and All Star under any of the Kickback or Cartel Agreements.

223.   The Bailey Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to Sierra Pacific related to the Bailey Plaintiffs' loan.

224.   The Bailey Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 185-195.

225.   The Bailey Plaintiffs believe, and therefore aver, that the documents they received at their closing, including their HUD-1, contain the false representations and omissions described in ¶¶ 201-205.

226.   The false representations and omissions in the Bailey Plaintiffs' loan closing documents are made for the purposes of concealing, and did so conceal from them, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Bailey

47

Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

227.   As is reasonable under the circumstances, the Bailey Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Bailey Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star, (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of their Sierra Pacific loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

228.   The Bailey Plaintiffs act diligently after their closing.  On or about November 13, 2018 the Bailey Plaintiffs receive a letter from undersigned counsel describing the describing an investigation of All Star and Sierra Pacific.  This is the Bailey Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their Sierra Pacific loan.

229.   Within days the Bailey Plaintiffs contact and retain counsel.  The Bailey Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

230.   As a result of Sierra Pacific and All Star's fraudulent concealment, and the Bailey Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations on their claims were tolled beginning on the date of their loan closing and continuing until the Bailey Plaintiffs learning of facts giving rise to their causes of action, on or about November 13, 2018.

B.      The Batton Plaintiffs' Reasonable Diligence

231.    As a result of the fraudulent concealments by Sierra Pacific and All Star, the Batton
        Plaintiffs have no actual notice before, at or after the closing of their Sierra Pacific loan
        of the illegal kickbacks, the exchange of any thing of value between Sierra Pacific and
        All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive
        nature of the prices charged for title and settlement services, or the coordinated business
        relationship of Sierra Pacific or All Star under the Kickback and Cartel Agreements.

232.    The Batton Plaintiffs exercise reasonable diligence before, during and after the closing of
        their loan.

233.    The Batton Plaintiffs receive loan documents prepared by Sierra Pacific in advance of
        their closing and review those loan documents.  The Batton Plaintiffs' pre-closing loan
        documents include their "Good Faith" Estimate which the Batton Plaintiffs believe, and
        therefore aver, Sierra Pacific prepared.  The Batton Plaintiffs' "Good Faith" Estimate
        does not include any description or statement of the coordinated business relationship
        between Sierra Pacific and All Star, or the fact that All Star has paid anything of value for
        Sierra Pacific's assignment and referral of the Batton Plaintiffs' loan to All Star. *See*
        **Exhibit 33**, Batton Plaintiffs' "Good Faith" Estimate.

234.    The Batton Plaintiffs' "Good Faith" Estimate contains the fraudulent representations and
        omission described in ¶¶ 197-201 above.

235.    The Batton Plaintiffs' pre-closing documents reflect Sierra Pacific and All Star's false
        allocation of fees, and, upon information and belief, contain a false APR as described in
        ¶¶ 185-195.

236.    The false statements and omissions made in the Batton Plaintiffs' pre-closing loan
        documents are made for the purposes of concealing, did so conceal from the Batton

Plaintiffs, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Batton Plaintiffs' loan, and the supracompetitive nature of prices charged them for title and settlement services.

237. As is reasonable under the circumstances, the Batton Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Batton Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star; (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of the Batton Plaintiffs' Sierra Pacific loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

238. The Batton Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, Sierra Pacific requires Batton Plaintiffs to participate in a closing, and Batton Plaintiffs attend and fully participate in the required closing, and review all documents with All Star's representative.

239. At the closing of their loan, the Batton Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Batton Plaintiffs review and sign all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

240. The documents the Batton Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of the coordinated business relationship between

Sierra Pacific and All Star under any of the Kickback or Cartel Agreements. *See* **Exhibit 25**, Batton Plaintiffs' HUD-1.

241. The documents the Batton Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to Sierra Pacific related to Batton Plaintiffs' loan.

242. The documents the Batton Plaintiffs receive at their closing, including their HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 185-195.

243. The documents the Batton Plaintiffs receive at their closing, including their HUD-1, contain the false representations and omissions described in ¶¶ 201-205.

244. The false representations and omissions in the Batton Plaintiffs' loan closing documents are made for the purposes of concealing, and did so conceal from the Batton Plaintiffs, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Batton Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

245. As is reasonable under the circumstances, the Batton Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Batton Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star, (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of their loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

246.   The Batton Plaintiffs act diligently after their closing.  On or about January 3, 2019, the Batton Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and Sierra Pacific.  This is the Batton Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their Sierra Pacific loan.

247.   Within days the Batton Plaintiffs contact and retain counsel.  The Batton Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

248.   As a result of the Sierra Pacific's and All Star's fraudulent concealment, and Batton Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations related to the Batton Plaintiffs' claims was tolled beginning on the date of their loan closing and continuing until the Batton Plaintiffs' learning of facts giving rise to their causes of action, on or about January 3, 2019.

   **C.       Gregory Dopkowski's Reasonable Diligence**

249.   As a result of the fraudulent concealments by Sierra Pacific and All Star, Plaintiff Dopkowski has no actual notice before, at or after the closing of his Sierra Pacific loan of the illegal kickbacks, the exchange of any thing of value between Sierra Pacific and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of Sierra Pacific or All Star under the Kickback and Cartel Agreements.

250.   Plaintiff Dopkowski exercises reasonable diligence before, during and after the closing of his loan.

251.   Plaintiff Dopkowski receives loan documents prepared by Sierra Pacific in advance of his closing and reviews those loan documents.

252.    Plaintiff Dopkowski believes, and therefore avers, that his pre-closing loan documents include Plaintiff Dopkowski's "Good Faith" Estimate which he believes, and therefore avers, Sierra Pacific prepared.  Plaintiff Dopkowski is not in possession of the "Good Faith" Estimate issued regarding his Sierra Pacific refinance and believe that document is in the sole possession of Sierra Pacific.

253.    Plaintiff Dopkowski believes, and therefore avers, that his "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between Sierra Pacific and All Star, or the fact that All Star has paid anything of value for Sierra Pacific's assignment and referral of Plaintiff Dopkowski's loan to All Star.

254.    Plaintiff Dopkowski believes, and therefore avers, that his "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between Sierra Pacific and All Star contains the fraudulent representations and omission described in ¶¶ 197-200 above.  Plaintiff Dopkowski believes and therefore avers that his "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to Plaintiff Dopkowski's refinance.

255.    Plaintiff Dopkowski believes, and therefore avers, that his pre-closing documents reflect Sierra Pacific and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 185-195.

256.    The false statements and omissions made in Plaintiff Dopkowski's pre-closing loan documents are made for the purposes of concealing, did so conceal from him, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Dopkowski's loan, and the supracompetitive nature of prices Plaintiff Dopkowski was charged for title and settlement services.

257.    As is reasonable under the circumstances, Plaintiff Dopkowski believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Dopkowski does not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star; (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of his Sierra Pacific loan for title and settlement services, or (iii) the prices he will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

258.    Plaintiff Dopkowski acts diligently during the closing or settlement of his loan.  As a condition of funding their loan, Sierra Pacific requires Plaintiff Dopkowski to participate in a closing, and Plaintiff Dopkowski attends and fully participates in the required closing.

259.    Plaintiff Dopkowski believes, and therefore avers, that at the closing of his loan, the Plaintiff Dopkowski receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  Plaintiff Dopkowski is not in possession of the documents received at his closing, including his HUD-1 issued regarding his Sierra Pacific loan, and believes that document is in the sole possession of Sierra Pacific.

260.    Plaintiff Dopkowski believes, and therefore avers, that the documents he receives at his closing, including his HUD-1, do not contain a description or statement of the coordinated business relationship between Sierra Pacific and All Star under any of the Kickback or Cartel Agreements.

261.    Plaintiff Dopkowski believes, and therefore avers, that the documents he receives at his closing, including his HUD-1, do not contain a description or statement of any payment,

amount or thing of value that was paid by All Star to Sierra Pacific related to Plaintiff Dopkowski's loan.

262. Plaintiff Dopkowski believes, and therefore avers, that the documents he receives at his closing, including his HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 185-195.

263. Plaintiff Dopkowski believes, and therefore avers, that the documents he receives at his closing, including his HUD-1, contain the false representations and omissions described in ¶¶ 201-205.

264. The false representations and omissions in Plaintiff Dopkowski's loan closing documents are made for the purposes of concealing, and did so conceal from Plaintiff Dopkowski, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Dopkowski's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

265. As is reasonable under the circumstances, Plaintiff Dopkowski believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Dopkowski does not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star, (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of his loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

266. Plaintiff Dopkowski acts diligently after his closing.  On or about January 3, 2019, Plaintiff Dopkowski receives a letter from undersigned counsel describing an

investigation of All Star and Sierra Pacific.  This is Plaintiff Dopkowski's first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their Sierra Pacific loan.

267.   Within days Plaintiff Dopkowski contacts and retains counsel.  Plaintiff Dopkowski files this Complaint within months of becoming aware of facts giving rise to his causes of action, injuries, and actual damages.

268.   As a result of the Sierra Pacific's and All Star's fraudulent concealment, and Plaintiff Dopkowski's reasonable diligence before, during and after the closing of his loan, the statute of limitations related to Plaintiff Dopkowski's claims was tolled beginning on the date of his loan closing and continuing until Plaintiff Dopkowski's learning of facts giving rise to his causes of action, on or about January 3, 2019.

**D.     The Patterson Parents Plaintiffs' Reasonable Diligence**

269.   As a result of the fraudulent concealments by Sierra Pacific and All Star, the Patterson Plaintiffs have no actual notice before, at or after the closing of their Sierra Pacific loan of the illegal kickbacks, the exchange of any thing of value between Sierra Pacific and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of Sierra Pacific or All Star under the Kickback and Cartel Agreements.

270.   The Patterson Parents Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

271.   The Patterson Parents Plaintiffs receive loan documents prepared by Sierra Pacific in advance of their closing and review those loan documents.

272.   The Patterson Parents Plaintiffs believe, and therefore aver, that their pre-closing loan documents include the Patterson Parents Plaintiffs' "Good Faith" Estimate which they

believe, and therefore aver, Sierra Pacific prepared.  The Patterson Parents Plaintiffs are not in possession of the "Good Faith" Estimate issued regarding their Sierra Pacific refinance and believe that document is in the sole possession of Sierra Pacific.

273.    The Patterson Parents Plaintiffs believe, and therefore aver, that their "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between Sierra Pacific and All Star, or the fact that All Star has paid anything of value for Sierra Pacific's assignment and referral of the Patterson Parents Plaintiffs' loan to All Star.

274.    The Patterson Parents Plaintiffs believe, and therefore aver, that their "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between Sierra Pacific and All Star contains the fraudulent representations and omission described in ¶¶ 197-200 above.  The Patterson Parents Plaintiffs believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to the Patterson Parents Plaintiffs' refinance.

275.    The Patterson Parents Plaintiffs believe, and therefore aver, that their pre-closing documents reflect Sierra Pacific and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 185-195.

276.    The false statements and omissions made in the Patterson Parents Plaintiffs' pre-closing loan documents are made for the purposes of concealing, did so conceal from them, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Patterson Parents Plaintiffs' loan, and the supracompetitive nature of prices the Patterson Parents Plaintiffs were charged for title and settlement services.

277.   As is reasonable under the circumstances, the Patterson Parents Plaintiffs believe these pre-closing documents and the representations made therein.   A reasonable borrower would have no reason to believe, and the Patterson Parents Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star; (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of their Sierra Pacific loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

278.   The Patterson Parents Plaintiffs act diligently during the closing or settlement of their loan.   As a condition of funding their loan, Sierra Pacific requires Patterson Parents Plaintiffs to participate in a closing, and Patterson Parents Plaintiffs attend and fully participate in the required closing, and review all documents with All Star's representative.

279.   At the closing of their loan, the Patterson Parents Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.   The Patterson Parents Plaintiffs review and sign all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

280.   The documents the Patterson Parents Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of the coordinated business relationship between Sierra Pacific and All Star under any of the Kickback or Cartel Agreements.   *See* **Exhibit 26**, Patterson Parents Plaintiffs' HUD-1.

281.   The documents the Patterson Parents Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of any payment, amount or thing of

value that was paid by All Star to Sierra Pacific related to Patterson Parents Plaintiffs' loan.

282.   The documents the Patterson Parents Plaintiffs receive at their closing, including their HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 185-195.

283.   The documents the Patterson Parents Plaintiffs receive at their closing, including their HUD-1, contain the false representations and omissions described in ¶¶ 201-205.

284.   The false representations and omissions in the Patterson Parents Plaintiffs' loan closing documents are made for the purposes of concealing, and did so conceal from the Patterson Parents Plaintiffs, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Patterson Parents Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

285.   As is reasonable under the circumstances, the Patterson Parents Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Patterson Parents Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star, (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of their loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

286.   The Patterson Parents Plaintiffs act diligently after their closing.  On or about January 3, 2019, the Patterson Parents Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and Sierra Pacific.  This is the Patterson Parents Plaintiffs'

first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their Sierra Pacific loan.

287. Within days the Patterson Parents Plaintiffs contact and retain counsel. The Patterson Parents Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

288. As a result of the Sierra Pacific's and All Star's fraudulent concealment, and the Patterson Parents Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations related to the Patterson Parents Plaintiffs' claims was tolled beginning on the date of their loan closing and continuing until the Patterson Parents Plaintiffs' learning of facts giving rise to their causes of action, on or about January 3, 2019.

### E.    The Patterson Plaintiffs' Reasonable Diligence

289. As a result of the fraudulent concealments by Sierra Pacific and All Star, the Patterson Plaintiffs have no actual notice before, at or after the closing of their Sierra Pacific loan of the illegal kickbacks, the exchange of any thing of value between Sierra Pacific and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of Sierra Pacific or All Star under the Kickback and Cartel Agreements.

290. The Patterson Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

291. The Patterson Plaintiffs receive loan documents prepared by Sierra Pacific in advance of their closing and review those loan documents.

292. The Patterson Plaintiffs believe, and therefore aver, that their pre-closing loan documents include the Patterson Plaintiffs' "Good Faith" Estimate which they believe, and therefore

aver, Sierra Pacific prepared.  The Patterson Plaintiffs are not in possession of the "Good Faith" Estimate issued regarding their Sierra Pacific refinance and believe that document is in the sole possession of Sierra Pacific.

293.   The Patterson Plaintiffs believe, and therefore aver, that their "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between Sierra Pacific and All Star, or the fact that All Star has paid anything of value for Sierra Pacific's assignment and referral of the Patterson Plaintiffs' loan to All Star.

294.   The Patterson Plaintiffs believe, and therefore aver, that their "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between Sierra Pacific and All Star contains the fraudulent representations and omission described in ¶¶ 197-200 above.  The Patterson Plaintiffs believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to the Patterson Plaintiffs' refinance.

295.   The Patterson Plaintiffs believe, and therefore aver, that their pre-closing documents reflect Sierra Pacific and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 185-195.

296.   The false statements and omissions made in the Patterson Plaintiffs' pre-closing loan documents are made for the purposes of concealing, did so conceal from them, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Patterson Plaintiffs' loan, and the supracompetitive nature of prices the Patterson Plaintiffs were charged for title and settlement services.

297.   As is reasonable under the circumstances, the Patterson Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would

have no reason to believe, and the Patterson Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star; (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of their Sierra Pacific loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

298.    The Patterson Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, Sierra Pacific requires the Patterson Plaintiffs to participate in a closing, and they attend and fully participate in the required closing.

299.    The Patterson Plaintiffs believe, and therefore aver, that at the closing of their loan, they receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Patterson Plaintiffs are not in possession of the documents received at their closing, including their HUD-1 issued regarding their Sierra Pacific loan, and believe that document is in the sole possession of Sierra Pacific.

300.    The Patterson Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, do not contain a description or statement of the coordinated business relationship between Sierra Pacific and All Star under any of the Kickback or Cartel Agreements.

301.    The Patterson Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to Sierra Pacific related to the Patterson Plaintiffs' loan.

302.   The Patterson Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 185-195.

303.   The Patterson Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, contain the false representations and omissions described in ¶¶ 201-205.

304.   The false representations and omissions in the Patterson Plaintiffs' loan closing documents are made for the purposes of concealing, and did so conceal from them, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Patterson Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

305.   As is reasonable under the circumstances, the Patterson Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Patterson Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star, (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of their Sierra Pacific loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

306.   The Patterson Plaintiffs act diligently after their closing.  On or January 3, 2019 the Patterson Plaintiffs receive a letter from undersigned counsel describing the describing an investigation of All Star and Sierra Pacific.   This is the Patterson Plaintiffs' first

indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their Sierra Pacific loan.

307.    Within days the Patterson Plaintiffs contact and retain counsel.  The Patterson Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

308.    As a result of Sierra Pacific and All Star's fraudulent concealment, and the Patterson Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations on their claims were tolled beginning on the date of their loan closing and continuing until the Patterson Plaintiffs learning of facts giving rise to their causes of action, on or about January 3, 2019.

**F.      The Welsh Plaintiffs' Reasonable Diligence**

309.    As a result of the fraudulent concealments by Sierra Pacific and All Star, the Welsh Plaintiffs have no actual notice before, at or after the closing of their Sierra Pacific loan of the illegal kickbacks, the exchange of any thing of value between Sierra Pacific and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of Sierra Pacific or All Star under the Kickback and Cartel Agreements.

310.    The Welsh Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

311.    The Welsh Plaintiffs receive loan documents prepared by Sierra Pacific in advance of their closing and review those loan documents.  The Welsh Plaintiffs' pre-closing loan documents include their "Good Faith" Estimate which the Welsh Plaintiffs believe, and therefore aver, Sierra Pacific prepared.  The Welsh Plaintiffs' "Good Faith" Estimate does not include any description or statement of the coordinated business relationship

between Sierra Pacific and All Star, or the fact that All Star has paid anything of value for Sierra Pacific's assignment and referral of the Welsh Plaintiffs' loan to All Star. *See* **Exhibit 34**, Welsh Plaintiffs' "Good Faith" Estimate.

312. The Welsh Plaintiffs' "Good Faith" Estimate contains the fraudulent representations and omission described in ¶¶ 197-201 above.

313. The Welsh Plaintiffs' pre-closing documents reflect Sierra Pacific and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 185-195.

314. The false statements and omissions made in the Welsh Plaintiffs' pre-closing loan documents are made for the purposes of concealing, did so conceal from the Welsh Plaintiffs, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Welsh Plaintiffs' loan, and the supracompetitive nature of prices charged them for title and settlement services.

315. As is reasonable under the circumstances, the Welsh Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Welsh Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star; (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of the Welsh Plaintiffs' Sierra Pacific loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

316.   The Welsh Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, Sierra Pacific requires Welsh Plaintiffs to participate in a closing, and Welsh Plaintiffs attend and fully participate in the required closing, and review all documents with All Star's representative.

317.   At the closing of their loan, the Welsh Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.   The Welsh Plaintiffs review and sign all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

318.   The documents the Welsh Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of the coordinated business relationship between Sierra Pacific and All Star under any of the Kickback or Cartel Agreements.  *See* **Exhibit 27**, Welsh Plaintiffs' HUD-1.

319.   The documents the Welsh Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to Sierra Pacific related to Welsh Plaintiffs' loan.

320.   The documents the Welsh Plaintiffs receive at their closing, including their HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 185-195.

321.   The documents the Welsh Plaintiffs receive at their closing, including their HUD-1, contain the false representations and omissions described in ¶¶ 201-205.

322.   The false representations and omissions in the Welsh Plaintiffs' loan closing documents are made for the purposes of concealing, and did so conceal from the Welsh Plaintiffs, the coordinated business relationship between Sierra Pacific and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the

Welsh Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

323.   As is reasonable under the circumstances, the Welsh Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Welsh Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Sierra Pacific and All Star, (ii) there has been any payment or exchange of a thing of value between Sierra Pacific and All Star related to the assignment and referral of their loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Sierra Pacific and All Star.

324.   The Welsh Plaintiffs act diligently after their closing.  On or about January 3, 2019, the Welsh Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and Sierra Pacific.  This is the Welsh Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their Sierra Pacific loan.

325.   Within days the Welsh Plaintiffs contact and retain counsel.  The Welsh Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

326.   As a result of the Sierra Pacific's and All Star's fraudulent concealment, and Welsh Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations related to the Welsh Plaintiffs' claims was tolled beginning on the date of their loan closing and continuing until the Welsh Plaintiffs' learning of facts giving rise to their causes of action, on or about January 3, 2019.

## VI.     Accrual and Tolling of Limitations

327.  The Batton Plaintiffs' claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15 U.SC. § 15(b), on the date of their injury, that is on or about September 30, 2015, the date their loan proceeds were disbursed and the Batton Plaintiffs incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements.  The Batton Plaintiffs' claims are brought within four years of that date, and are not subject to any limitations defense.

328.  In addition, Plaintiff Dopkowski's claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15 U.SC. §15(b), on the date of his injury, that is on or about October 26, 2015, the date his loan proceeds were disbursed and Plaintiff Dopkowski incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements. Plaintiff Dopkowski's claims are brought within four years of that date, and are not subject to any limitations defense.

329.  The Patterson Parents Plaintiffs' claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15 U.SC. § 15(b), on the date of their injury, that is on or about September 21, 2015, the date their loan proceeds were disbursed and the Patterson Parents Plaintiffs incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements.  The Patterson Parents Plaintiffs' claims are brought within four years of that date, and are not subject to any limitations defense.

330.  The Patterson Plaintiffs' claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15

U.SC. § 15(b), on the date of their injury, that is on or about June 10, 2015, the date their loan proceeds were disbursed and the Patterson Plaintiffs incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements. The Patterson Plaintiffs' claims are brought within four years of that date, and are not subject to any limitations defense.

331. The Welsh Plaintiffs' claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15 U.SC. § 15(b), on the date of their injury, that is on or about February 27, 2015, the date their loan proceeds were disbursed and the Welsh Plaintiffs incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements. The Welsh Plaintiffs' claims are brought within four years of that date, and are not subject to any limitations defense.

332. In addition, and in the alternative, the limitations period provided in 15 U.S.C. § 15(b), applicable to claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964, is subject to the discovery of injury rule. *Detrick v. Panalpina,* 108 F.3d 529 (4th Cir. 1997) *cert. denied* 1997 U.S. Dist. LEXIS 4626. Sierra Pacific's affirmative acts precluded Sierra Pacific borrowers, including all Plaintiffs and Class Members, from discovering the fixed and supracompetitive nature of the prices charged for title and settlement services, and affirmatively prevented Sierra Pacific borrowers, including Plaintiffs and Class Members, from discovering the fact of their injuries resulting therefrom.

333. As a result, Plaintiffs', and Class Members', claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 did not accrue, for the purpose of the limitations period provided in 15 U.S.C. § 15(b), until such time as Plaintiffs, and Class Members, knew, or should have known, of their injury – for the Bailey Plaintiffs, on or about November 13, 2018, and for

the Batton Plaintiffs, Gregory Dopkowski, the Patterson Parents Plaintiffs, the Patterson Plaintiffs and the Welsh Plaintiffs, on or about January 3, 2019.

334.   In addition and in the alternative, as a result of Sierra Pacific's and All Star's fraudulent concealments and Plaintiffs' reasonable diligence before, during and after the closing of Plaintiffs' loans, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of each Plaintiffs' loan closing and continuing until the learning of facts giving rise to the causes of action pled herein: for the Bailey Plaintiffs, on or about November 13, 2018, and for the Batton Plaintiffs, Gregory Dopkowski, the Patterson Parents Plaintiffs, the Patterson Plaintiffs, and the Welsh Plaintiffs, on or about January 3, 2019.

335.   Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the Kickback and Cartel Agreements and the All Star Scheme, and typical of all alleged Class Members' transactions such that all Class Members are entitled to the equitable tolling of applicable limitations period.

## COUNT I
### Violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(a)

336.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

337.   All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

338.   Sierra Pacific laundered by and through its president, mortgage brokers, loan officers, employees and/or agents received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

339. All loans referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by Sierra Pacific and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

340. The payment and/or arranging of payment of kickbacks to Sierra Pacific by All Star and Sierra Pacific's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

341. Plaintiffs allege claims for violations of 12 U.S.C. §2607(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Sierra Pacific Mortgage Company, Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2012 and December 31, 2016. Exempted from this class is any person who, during the period of January 1, 2012 through December 31, 2016, was an employee, officer, member and/or agent of Sierra Pacific Mortgage Company, Inc. or All Star Title, Inc.

> (the "RESPA Class").

342. There are questions of law and fact common to the claims of each and all members of the RESPA Class. These common questions include, but are not limited to:

a. Whether there existed a referral agreement between Sierra Pacific and All Star whereby Sierra Pacific agreed to assign and refer Sierra Pacific loans, refinances and reverse mortgages to All Star in return for kickbacks;

b. Whether Sierra Pacific and its employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

c.  Whether the illegal kickbacks to Sierra Pacific and its employees and/or agents violated RESPA;

d.  Whether Sierra Pacific and All Star used third party marketing companies to launder kickbacks related to Sierra Pacific loans;

e.  Whether Plaintiffs and RESPA Class Members were forced to pay more for said settlement services;

f.  Whether Sierra Pacific used sham and/or split invoices and sham payment records to actively and fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

g.  Whether Sierra Pacific disclosed or described to any borrower its coordinated business relationship with All Star or the fact that a thing of value had been exchanged between Sierra Pacific and All Star related to any borrower's loan;

h.  Whether Sierra Pacific disclosed or described on any borrowers "Good Faith" Estimate, HUD-1 or other loan document Sierra Pacific's coordinated business relationship with All Star or the fact that a thing of value had been exchanged between Sierra Pacific and All Star related to any borrower's loan;

i.  Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel;

j.  Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

k.  Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

343. These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

344. Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RESPA Class Members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

345. Plaintiffs will fairly and adequately protect the interests of the RESPA Class. The interests Plaintiffs and all other members of the RESPA Class are identical.

346. Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S. District Courts in similar litigation, and will adequately represent the RESPA Class's interests.

347. The RESPA Class consists of borrowers on more than 300 loans, and thus are so numerous that joinder of all members is impracticable.

348. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Sierra Pacific.

349. This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

350. Most members of the RESPA Class are unaware of their rights to prosecute a claim against Sierra Pacific.

351.   No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**COUNT II**
**Violation of the Sherman Act,**
**15 U.S.C. § 1**

352.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

353.   All Star and Sierra Pacific conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans, in violation of the Sherman Act, 15 U.S.C. § 1.

354.   As a direct and proximate result of the Cartel Agreements between Sierra Pacific and All Star, Plaintiffs and Class Members were charged and paid supracompetitive prices for title and settlement services and were charged and paid more for title and settlement services than they otherwise would have without the Cartel Agreements.

355.   As a direct and proximate result of the Cartel Agreements between Sierra Pacific and All Star, Plaintiffs and Class Members were injured and suffered actual damages in the amount of at least $300.00, which is the minimum difference between the lowest amount charged by All Star for settlement services with another lender and the amount charged to Plaintiffs under the Price Fixing and Minimum Fee Agreements with Sierra Pacific and is the Kickback Overcharge.

356.   Plaintiffs allege claims pursuant to Fed. R. Civ. P. 23 for violations of 15 U.S.C. § 1 ("Antitrust Class"), with the alleged Antitrust Class defined as:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Sierra Pacific Mortgage Company, Inc. for which All Star Title, Inc. provided a settlement service, as identified in

Section 1100 on the borrower's HUD-1, between January 1, 2012 and December 31, 2017. Exempted from this class is any person who, during the period of January 1, 2012 through December 31, 2017, was an employee, officer, member and/or agent of Sierra Pacific Mortgage Company, Inc. or All Star Title, Inc.

357. The Antitrust Class consists of borrowers on more than 300 loans, and thus are so numerous that joinder of all members is impracticable.

358. There are questions of law and fact common to the claims of each and all members of the Antitrust Class. These common questions include, but are not limited to:

    a. Whether Sierra Pacific and its employees and/or agents violated the Sherman Act by conspiring to and fixing the title and settlement services fees charged to and paid by Plaintiffs and Antitrust Class Members;

    b. Whether Sierra Pacific and its employees and/or agents violated the Sherman Act by conspiring to and agreeing to supporting the Price Fixing and Minimum Fee Agreements through a concerted refusal to deal with non-cartel title and settlement service companies on all Sierra Pacific loans generated by the Kickback Agreement;

    c. Whether the prices charged Sierra Pacific borrowers pursuant to the Cartel Agreements were supracompetitive, and higher than prices that would have been charged without the Cartel Agreements;

    d. Whether Sierra Pacific made false representations to borrowers to actively conceal the Cartel Agreements and supracompetitive prices resulting therefrom;

    e. Whether All Star falsely allocated fees to actively conceal the Cartel Agreements and the supracompetitive prices charged Sierra Pacific borrowers in performance of those agreements;

f.   Whether Sierra Pacific made false representations on Sierra Pacific borrowers' Good Faith Estimates, HUD-1s and other loan documents to actively conceal the Cartel Agreements and the supracompetitive prices charged Sierra Pacific borrowers in performance of those agreements;

g.   Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the Cartel Agreements, the supracompetitive prices charged for title and settlement services, and their injuries and actual damages therefrom, until contacted by counsel;

h.   Whether Plaintiffs and the Antitrust Class are entitled to treble damages under the Sherman Act; and

i.   Whether Plaintiffs and the Antitrust Class are entitled to attorneys' fees and expenses under the Sherman Act.

359.   These common issues of law and fact predominate over any question affecting only individual Antitrust Class Members.

360.   Plaintiffs' transactions and claims are typical of the claims or defenses of the respective Antitrust Class Members, and are subject to the same statutory measure of damages set forth in 15 U.S.C. § 15(a).

361.   Plaintiffs will fairly and adequately protect the interests of the Antitrust Class. The interests of the named Plaintiffs and all other members of the Antitrust Class are identical.

362.   Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the Antitrust Class's interests.

363. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Sierra Pacific.

364. This action entails questions of law and fact common to Antitrust Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

365. Most members of the Antitrust Class are unaware of their rights to prosecute a claim against Sierra Pacific.

366. No member of the Antitrust Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

### COUNT III
### Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962

367. Plaintiffs incorporate the above stated paragraphs as if restated herein.

368. Sierra Pacific is a "person" as defined under 18 U.S.C. § 1961(3).

369. The All Star Scheme constitutes an enterprise for the purposes of 18 U.S.C. § 1962(a). The activities of the All Star Scheme Enterprise affect interstate commerce across more than 30 states.

370. Sierra Pacific and All Star perpetrated the All Star Scheme for the purpose of defrauding borrowers into paying fixed and supracompetitive prices for title and settlement services related to Sierra Pacific residential mortgage, refinance and reverse mortgages, and to thereby deprive borrowers of their money and/or property.

371.    The use of the U.S. Mail and interstate wires by Sierra Pacific and All Star in furtherance of the All Star Scheme, as pled herein, constitutes a pattern of racketeering activity.

372.    Sierra Pacific received, and continues to receive, income derived from this pattern of racketeering activity in the form of the kickbacks paid by All Star to Sierra Pacific, and through the interest, fees and other income earned on the Sierra Pacific mortgages, refinances and reverse mortgages resulting from the pattern of racketeering activity.

373.    Sierra Pacific improperly used and invested the income it received from the pattern of racketeering activity in furtherance of the All Star Scheme Enterprise and for the purpose of luring borrowers into the All Star Scheme Enterprise in violation of 18 U.S.C. § 1962.

374.    As a direct and proximate result of Sierra Pacific's pattern of racketeering activity, Plaintiffs and Class Members were injured and suffered actual damages in the amount of at least $300.00, which is the minimum difference between the lowest amount charged by All Star for settlement services with another lender and the amount charged to Plaintiffs under the Price Fixing and Minimum Fee Agreements with Sierra Pacific and is the Kickback Overcharge.

375.    Plaintiffs allege claims pursuant to Fed. R. Civ. P. 23 for violations of 18 U.S.C. § 1962(a) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Sierra Pacific Mortgage Company, Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2012 and December 31, 2017.  Exempted from this class is any person who, during the period of January 1, 2012 through December 31, 2017, was an employee, officer, member and/or agent of Sierra Pacific Mortgage Company, Inc. or All Star Title, Inc.

376. The RICO Class consists of borrowers on more than 300 loans, and thus are so numerous that joinder of all members is impracticable.

377. There are questions of law and fact common to the claims of each and all members of the RICO Class.  These common questions include, but are not limited to:

   a.  Whether Sierra Pacific and its employees and/or agents violated RICO by defrauding borrowers, including Plaintiffs and RICO Class Members, into paying supracompetitive prices for title and settlement services and fund the kickbacks All Star is paying Sierra Pacific;

   b.  Whether Sierra Pacific and All Star formed an enterprise;

   c.  Whether the activities of the All Star Scheme Enterprise affected interstate commerce;

   d.  Whether one purpose of the All Star Scheme was to deprive borrowers of money or property;

   e.  Whether Sierra Pacific and All Star used the interstate U.S. Mail in furtherance of the All Star Scheme and All Star Scheme Enterprise;

   f.  Whether Sierra Pacific and All Star used the interstate wires in furtherance of the All Star Scheme and the All Star Scheme Enterprise;

   g.  Whether Sierra Pacific received income from a pattern of racketeering activity;

   h.  Whether Sierra Pacific used income derived from a patter of racketeering activity in support of, or in furtherance of, the All Star Scheme Enterprise;

   i.  Whether Sierra Pacific actively conceal the All Star Scheme, the supracompetitive prices, and the All Star Scheme Enterprise;

   j.  Whether Plaintiffs' and RICO Class members knew or should have known of their injuries resulting from Sierra Pacific's violation of 18 U.S.C. § 1962(a);

k.  Whether Sierra Pacific and All Star's fraudulent concealments prevented Plaintiffs' and RICO class members from discovering their injuries proximately caused by the Sierra Pacific's pattern of racketeering activity;

l.  Whether Plaintiffs and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. § 1964(c); and

m.  Whether Plaintiffs and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. § 1964(c).

378.  These common issues of law and fact predominate over any question affecting only individual RICO Class Members.

379.  Plaintiffs' transaction and claims are typical of the claims or defenses of the respective RICO Class Members, and are subject to the same statutory measure of damages set forth in 18 U.S.C. § 1964(c).

380.  Plaintiffs will fairly and adequately protect the interests of the RICO Class. The interests of the named Plaintiffs and all other members of the RICO Class are identical.

381.  Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the RICO Class's interests.

382.  Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Sierra Pacific.

383.  This action entails questions of law and fact common to RICO Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

384.   Most members of the RICO Class are unaware of their rights to prosecute a claim against Sierra Pacific.

385.   No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

   **WHEREFORE**, Plaintiffs respectfully demand:

a.   This Court to certify the RESPA, Antitrust, and RICO Classes pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial;

b.   Judgment for Plaintiffs and RESPA Members against Sierra Pacific Mortgage Company, Inc., and award Plaintiffs and RESPA Class Members treble damages for title and settlement services charged by All Star, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c.   Judgment for Plaintiffs and Antitrust Class Members against Sierra Pacific Mortgage Company, Inc., and award Plaintiffs and Antitrust Class Members damages in the amount equal to three times the actual damages caused by the Cartel Agreements pursuant to 15 U.S.C. § 15(a);

d.   Judgment for Plaintiffs and RICO Class Members against Sierra Pacific Mortgage Company, Inc., and award Plaintiffs and RICO Class Members damages in the amount equal to three times the actual damages caused by the All Star Scheme pursuant to 18 U.S.C. § 1964(c);

e.   Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5), 15 U.S.C. § 15(a), and 18 U.S.C. § 1964(c); and

f.   For such other and further relief as this Court deems proper.

Respectfully submitted,


_____/s/_____          _____/s/_____
Timothy F. Maloney, Esq. #03381          Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679          Melissa L. English, Esq. #19864
Megan A. Benevento, Esq. #19883          Sarah A. Zadrozny, Esq. #13911
Joseph, Greenwald & Laake, P.A.          Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400                 600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770                Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)    (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com               Email: mpsmith@sgs-law.com
vnannis@jgllaw.com                       menglish@sgs-law.com
mbenevento@jgllaw.com                    szadrozny@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*   *Counsel for Plaintiffs and Class Members*


## PRAYER FOR JURY TRIAL

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action

Complaint.

_____/s/_____          _____/s/_____
Timothy F. Maloney, Esq. #03381          Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679          Melissa L. English, Esq. #19864
Megan A. Benevento, Esq. #19883          Sarah A. Zadrozny, Esq. #13911
Joseph, Greenwald & Laake, P.A.          Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400                 600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770                Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)    (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com               Email: mpsmith@sgs-law.com
vnannis@jgllaw.com                       menglish@sgs-law.com
mbenevento@jgllaw.com                    szadrozny@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*   *Counsel for Plaintiffs and Class Members*